**UNITED STATES of America**

**v.**

**ANTENNA SYSTEMS, INC.**

**Civ. A. No. 2503.**

United States District Court
D. New Hampshire.

March 16, 1966.

Louis M. Janelle, U. S. Atty., Concord, N. H., for plaintiff.

Wyman, Bean & Tefft, Stanton E. Tefft, Manchester, N. H., for defendant.

James A. Connor, Manchester, N. H., trustee, pro se.

John M. Geaghan, Waltham, Mass., and Sulloway, Hollis, Godfrey & Soden, Joseph S. Ransmeier, Concord, N. H., for Raytheon Mfg. Co.

Charles E. Chretien, Manchester, N. H., for Kaydon Engineering Corp.

William Maynard, Atty. Gen., Concord, N. H., for State of N. H.

CAFFREY, District Judge.*

This matter came before the court on cross-motions for summary judgment filed by the United States and by the trustee in bankruptcy of Antenna Systems, Inc. The suit began as a petition for injunctive relief in which the United States sought to obtain possession of its collateral under a loan agreement. By agreement of the parties, most of the disputed property was sold and the proceeds of the sale are being held in escrow pending a determination of the rights of the parties.

Antenna Systems, Inc. (Antenna) and the New England Merchants National Bank entered into a loan agreement on August 26, 1963, by the terms of which Antenna granted the following security interest to the bank:

"2.3 The Borrower hereby grants to the Financing Institution a security interest

(a) in the Borrower's present and future inventory (including supplies, raw materials, work in process and finished goods), including but not limited to inventory acquired or produced by the Borrower for the purpose of performance of defense production contracts (as defined in the Guarantee Agreement) assigned to the Financing Institution;

(b) in all present and future contract rights to receive payments for inventory or for services performed or to be performed by the Borrower, including but not limited to rights under such assigned defense production contracts;

(c) in all present and future accounts receivable, notes, drafts, acceptances and other forms of obligations and receivables for goods sold or leased by the Borrower or for services rendered by it and in all guaranties and securities therefor;

(d) in the proceeds of all such present and future accounts receivable, notes, drafts, acceptances, contract rights and other forms of obligations and receivables; and

(e) all furniture, fixtures, and equipment now owned and hereafter acquired by the Borrower.

Such security interest as the Financing Institution now has securing the Borrower's present indebtedness to it shall continue under the Loan Agreement subject to the terms hereof."

The agreement also designates that the debtor's only place of business was at Grenier Field, Manchester, New Hampshire.

The United States guaranteed the loan. When Antenna defaulted on its obligations to the bank under the agreement, the bank endorsed the outstanding note of Antenna to the United States and assigned all collateral held by the bank under the loan agreement to the United States. Thereafter, a petition in bankruptcy was filed and a trustee was appointed for Antenna. A controversy has

* Sitting by designation.

arisen between the trustee and the United States which presents the questions (1) whether the security agreement is sufficiently specific, and if so (2) whether certain property is subject to the security interest of the United States, and (3) whether an $8,000 payment to Antenna from one of its suppliers is subject to the security interest of the United States. A claim to certain property has also been filed on behalf of Raytheon Company.[1]

(1) The trustee in bankruptcy of Antenna contends that the language "all furniture, fixtures, and equipment now owned and hereafter acquired by the borrower" does not reasonably identify the collateral as required by Sec. 9–110 of the Uniform Commercial Code.[2]

■ I find and rule that the loan agreement reasonably identifies the collateral and that the United States has a security interest in all furniture, fixtures, and equipment of Antenna. National Cash Register Co. v. Firestone & Co., Inc., 346 Mass. 255, 191 N.E.2d 471 (1963); Thomson v. O. M. Scott Credit Corp., 28 Pa.Dist. & Co.R.2d 85 (Chester County Ct., Pa., 1962).

(2) The next issue in this case is whether the following property is covered by the security agreement:

a. All drawings, reports, catalogs, literature, etc.

b. All bids, proposals, cost estimates, etc. completed or presently outstanding.

c. All proprietary tooling, including jigs, fixtures, patterns, core boxes, molds, templates, stampings, dies,

truss boards, used to manufacture the following:

| 12' | Reflectors | WR–975 Horn Dual Polarized |
| 16' | " | WR–430 " " " |
| 30' | " | Waveguide components |
| 40' | " | |
| 60' | " | |
| 85' | " | |
| 120' | " | |

Also included, but not specifically called out, would be catalog item type of equipment.

The trustee argues that these items of property are general intangibles as defined in Sec. 9–106 and, therefore, not subject to the security agreement, which, curiously enough, totally omits any reference to the category of general intangibles. The United States, however, contends that these items of property are not general intangibles but are "goods" under Sec. 9–105(f), i. e., that these items are either inventory or equipment and, therefore, subject to the security interest granted by the loan agreement.

Mr. Charles W. Creaser, who was the President of Antenna from its inception until it went into bankruptcy, testified about the character of this property, what it is, what uses the company put it to, etc.

(a) The property listed in paragraph a. consists basically of the blueprints and technical data produced when the company's engineering staff designed a product. In some instances, these drawings and blueprints related to a specific contract for design and development of a product for a particular customer. These were considered to be the property

1. The trustee is holding the proceeds of certain accounts receivable. He requested and obtained from the Court time to take a deposition in order to determine whether to assert that these proceeds and other funds which had been turned over to the bank could be claimed by him and added to the bankrupt estate on the ground that they constituted the proceeds of transactions which were voidable as preferences under the Bankruptcy Act. Thereafter, the deposition of a representative of the New England Merchants National Bank was taken in November of 1965 and subsequently filed in court. On December 30, 1965 the trustee advised the court that he had completed his investigation of possible preferences and requested no further hearings on that aspect of the case. I interpret the non-filing of a motion by the trustee as evidence of the fact that he is satisfied, on the basis of his investigation, that the available evidence is inadequate to establish any voidable preferences herein, and I so rule.

2. The Code was in effect in both New Hampshire and Massachusetts at all times material to this case.

of the customer who had paid for the work. These blueprints were confidential and under no circumstances did or would Antenna give them to competitors of the customer, or use them on contracts with competitors of the customer. A second category of blueprints were those of standard products manufactured by Antenna and sold in the open market. These drawings in most cases were never released outside to other customers. In a third category were purely research and development blueprints and drawings which were also confidential. These related to basic research carried on by Antenna which might or might not develop a saleable product. All these blueprints and technical data were prepared primarily by Antenna's engineering department, though at times consultants were hired who also prepared drawings and engineering reports.

■ Compelled by the provisions of the Code to classify as falling into one of two mutually exclusive categories of collateral, property which arguably fits into both categories but which fits neatly into neither category, I rule that for purposes of this case these blueprints, drawings, etc., in reality the visual reproductions on paper of engineering concepts, ideas and principles, are general intangibles within the meaning of that term as used in the Uniform Commercial Code. They are not "goods" as that term is used in the Code and consequently are not covered by the security agreement, are not property of the United States, and, on the contrary, are assets of the bankrupt estate. See Sec. 9–106 and comment thereto.

■ (b) The second category of disputed property (all bids, proposals, cost estimates, etc., completed or presently outstanding) refers to information compiled by Antenna in the process of bidding on numerous contracts. Once management decided to bid on a contract, the engineering department and other departments were told to prepare a bid. Usually a technical proposal had to be prepared. Considerable time and money went into these proposals, which often did not result in a contract. As more and more of these technical proposals were put together, it became easier to prepare them because the staff could draw information from past proposals in the company's files. This backlog of information was valuable to the corporation and would be valuable to any going concern in the industry.

I rule that these bids, proposals, cost estimates, etc. are general intangibles within the meaning of the Uniform Commercial Code, are not covered by the security agreement, and consequently are assets of the bankrupt estate.

■ (c) The third category of property fits more neatly into the definitions of the Code. This tooling is "used to manufacture" products sold by the company. According to Mr. Creaser's testimony this tooling, etc. was used to "produce the part so you can duplicate it time after time again." I find and rule that this property is goods as defined in Sec. 9–105(f). See Sec. 9–109(2) and comment thereto. The property is subject to the security interest of the United States and consequently is not an asset of the bankrupt estate.

■ "Catalog item type of equipment" refers to standard component parts of antenna systems which had been manufactured and were on hand in various departments of the company. I find and rule that this property is goods as defined in Sec. 9–105(f). See 9–109(4) and comment thereto. This property also is subject to the security interest of the United States and consequently not an asset of the bankrupt estate.

(3) A final item as to which the parties are in dispute is the question of ownership of an $8,000 payment made to Antenna by the Philadelphia Gear Corporation. I find that in the course of producing an antenna system for General Electric, Antenna used as one of the components in the assembly thereof a gear box supplied by Philadelphia Gear. Antenna completely performed and received full payment for this contract from General Electric. In the course of performance of the contract, however, res-

ervations and doubt arose in the minds of the executives of Antenna as to whether or not the gear boxes supplied by Philadelphia would perform successfully during the period covered by Antenna's warranty to General Electric. As a result of these doubts and reservations, Antenna gave serious consideration to developing its own gear box for use in future contracts. Discussions ensued between representatives of Philadelphia and Antenna, as a result of which, although no specific claim for breach of warranty had been made by Antenna to Philadelphia, and although counsel had not been retained by either Antenna or Philadelphia with regard to any possible claim by Antenna for breach of warranty, Philadelphia decided to make payment to Antenna in the amount of $8,000.

I find that this $8,000 payment cannot be attributed to any claim of breach of warranty by Antenna against Philadelphia, nor to any legally enforceable contract requiring Antenna to continue to purchase gear boxes from Philadelphia. The payment appears to be in the nature of an inducement to Antenna to continue what apparently was an advantageous business relationship, from the viewpoint of Philadelphia, and appears to be the product of a "practical business judgment" on the part of the executives of both companies. Among the advantages to Antenna of accepting this payment would appear to be the receipt of $8,000 badly needed cash and the avoiding of the expense of a research and development program to design and manufacture its own gear box.

On the basis of the above I rule that the $8,000 payment is not attributable to any account or contract right or other obligation set out in paragraph 2.3 (b), (c) and (d) of the security agreement and, therefore, is an asset of the bankrupt estate.

(4). Raytheon Company filed an answer in this case and claimed the property listed in Schedules A and B of its answer. The only items still in dispute are certain drawings prepared by Antenna for Raytheon. The Government in fact concedes that Raytheon's rights in this property are superior to those of the other parties, but contends that Raytheon is not entitled to possession of the property without making an additional payment for it. I find, on the basis of the testimony of Mr. Creaser, and on the basis of the contract between Raytheon and Antenna, that these drawings are the property of Raytheon, that Raytheon has already paid for them as a part of the contract price, and that Antenna would have returned them to Raytheon without further charge if requested to do so. Accordingly, I rule that Raytheon is entitled to possession of these drawings without again paying for them.

Judgment will be entered on the cross-motions for summary judgment in accordance with the rulings contained in this opinion.