**In re BLANKINSHIP–COOPER, INC., Debtor.**

**ESTATE OF A.R. LEVIS, Plaintiff,**

**v.**

**BLANKINSHIP–COOPER, INC., d/b/a 440 Ranches, Norman Blankinship, and Interfirst Bank of Dallas, Defendants.**

**Bankruptcy No. 384–30041 M–11. Adv. No. 384–3247.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Sept. 20, 1984.

---

Bill Kuhn, Baker, Miller, Mills & Murray, Dallas, Tex., for plaintiff.

Mark E. MacDonald, Johnson & Swanson, Dallas, Tex., for Interfirst Bank of Dallas.

Gerald P. Urbach, Geary, Stahl & Spencer, Dallas, Tex., for Trustee.

## MEMORANDUM OPINION

ROBERT C. McGUIRE, Bankruptcy Judge.

This adversary action was commenced on April 13, 1984, by the Estate of A.R. Levis ("Levis") as an action for declaratory judgment against InterFirst Bank Dallas ("In-terFirst") and Blankinship-Cooper, Inc. ("Debtor"), to determine the effect of separate security agreements of the debtor with Levis and InterFirst which both purport to perfect liens in Shawne Bug, an American Quarter Horse Stallion.

The issue presented for determination in this case is the classification, under Chapter 9 of the Texas Business and Commerce Code ("Code"), of breeding rights in Shawne Bug. For reasons set out in this opinion, I hold that Levis has a prior perfected security interest in both the horse and the breeding rights in the horse.

The Court's Findings of Fact and Conclusions of Law on file are incorporated herein by reference. The Court makes the following additional findings of fact and conclusions of law in accordance with Rule 7052 of the Bankruptcy Rules.

On August 3, 1981, Levis sold the American Quarter Horse Stallion, Shawne Bug, to the debtor in consideration for two hundred fifty thousand dollars ($250,000) in cash and a promissory note payable to Levis in the principal sum of one million dollars ($1,000,000). In connection with such promissory note, Levis received a purchase money security interest in Shawne Bug[1] which was properly filed and perfected under the Code in August of 1981.

In February of 1982, InterFirst, pursuant to a security agreement stemming from a series of loans made to the debtor aggregating over nineteen million dollars ($19,-000,000), properly filed and perfected a security interest in Shawne Bug and the debtor's other horses, and in general intangibles[2] of the debtor. In addition to having a perfected security interest in the debtor's general intangibles, InterFirst is in posses-

---

1. The security agreement dated August 3, 1981, gave Levis "a purchase money security interest *in and to all of the Debtor's interest and property rights,* whether now owned or hereafter acquired in and to the following Quarter Horse Stallion: SHAWNE BUG, having the American Quarter Horse Association Registration No. 1065341." [Emphasis supplied]. The Levis financing statement shows the collateral to be "SHAWNEE BUG (QUARTER HORSE STALLION AQHA Reg. No. 1065341)".

2. The security agreement, dated December of 1981, gave InterFirst a security interest in various items of collateral including: "Whether now owned or hereafter acquired by Debtor, and wherever located, any and all present or future accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory, and equipment".

sion of the registration certificate of Shawne Bug issued under the auspices of the American Quarter Horse Association, the recorder of pedigrees and performances of American Quarter Horses. The registration certificate shows the debtor as owner of the horse.

It is the contention of InterFirst that its possession of the A.Q.H.A. registration certificate on Shawne Bug and its perfected security interest in "general intangibles" of the debtor gives InterFirst a superior lien position in Shawne Bug's breeding rights. InterFirst contends that Levis' security interest includes only the substance of the animal and excludes the rights to breed the horse and that, therefore, Levis allegedly can be required to take the value of Shawne Bug as a non-registered grade horse. The present value of Shawne Bug with his A.Q.H.A. certificate, or in circumstances where a duplicate could be obtained, is in the range of $400,000 to $750,000. Without registration with the A.Q.H.A., Shawne Bug's value would not exceed $3,500.

Two sub-issues are thus raised for determination. First, what is the effect of possession of the American Quarter Horse Association registration certificate of Shawne Bug by InterFirst on title to the horse and title to the certificate itself under Code § 9.305; and second, under the circumstances of this case, does the prior perfected security interest of Levis in the Quarter Horse Stallion perfect an interest in all rights in the horse, including the breeding rights, or does a subsequently perfected security interest in general intangibles of the debtor attach to the breeding rights in the horse and defeat the prior security interest of Levis.

## I.

### EFFECT OF POSSESSION OF THE AMERICAN QUARTER HORSE ASSOCIATION REGISTRATION CERTIFICATE

In the bulk of secured financing transactions, a financing statement is filed by the secured party to perfect a security interest in the collateral of the debtor. WHITE & SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE § 23–5 (2d ed. 1980). Code § 9.302(a)(1) provides that a financing statement need not be filed to perfect a security interest in collateral that is in possession of the secured party under § 9.305. Code § 9.305 forms the basic mechanism for perfection by a secured party by possession of collateral and provides, in relevant part, "A security interest in letters of credit and advices of credit, ... goods, instruments, ... money, negotiable documents, or chattel paper may be perfected by the secured party's taking possession of the collateral ...". Essential to a determination of the effect of possession by InterFirst of the American Quarter Horse registration certificate in Shawne Bug is resolution of the question of whether the certificate falls into one of the categories listed by § 9.305. Instructive to disposition of this issue is *Lee v. Cox*, 18 U.C.C.Rep. 807 (M.D.Tenn.1976). In *Lee*, Appellant Cox sold eight Arabian horses to Appellee Lee and retained the registration certificates, which were not to be released to Lee until Cox received payment in full. After Lee filed a Chapter XI bankruptcy proceeding, he initiated an action to compel turnover of the registration certificates. At the trial level, the Bankruptcy Judge ordered the registration certificates to be turned over to Lee and directed Lee to sell the horses immediately at the highest possible price and place the proceeds of the sale in escrow until proper distribution could be determined.

Upon appeal to the District Court, the issue centered around the characterization of the registration certificates as collateral under U.C.C. Article 9. The holdings of the case dealt with the effect of possession of the certificates with respect to the horses and the papers themselves. First, it was held that because the registration papers

could not be classified under § 9–305,[3] possession of the papers did not perfect a security interest in the horses. Second, it was held that even though the papers could not be fit into a category that would allow their perfection by possession under § 9–305, the papers were nevertheless perfected under the rationale that third parties would be alerted by such possession in furtherance of basic Code concerns.

Since possession of the registration papers was held to perfect a security interest in the papers, the District Court held that Cox was not obligated to turn the papers over to Lee.

The holding of the District Court in *Lee* would appear to give InterFirst a perfected security interest in the A.Q.H.A. certificate in its possession. However, upon closer analysis of the present facts, this conclusion is questionable on several grounds. Like the registration certificates issued in *Lee*, American Quarter Horse Association registration certificates clearly do not possess the qualities which would allow them to be fit into one of the categories of § 9.305. *See supra*, n. 3. To characterize a registration certificate as an instrument would be a conceptual anomaly. *See generally* R. Lester, *Security Interests in Thoroughbred and Standard Bred Horses: A Transactional Aproach*, 70 KY.L.J. 1065 (1981–82). Under Rule 25 of the *Official Handbook of the American Quarter Horse Association* (32d ed. 1984), "Ownership of an issued registration certificate remains with the Association; ...". Since the registration certificate does not possess attributes of negotiability (a requirement under the Code definition of instrument, *see* § 9.105(a)(9)), and can be owned only by the Association, it is not the complete embodiment of the underlying right and therefore not an instrument which can be perfected by possession under § 9.305.[4]

The Court in *Lee* recognized that registration certificates do not fit any of the categories which would allow perfection by possession under § 9.305. *See Lee v. Cox, supra* at 809–10. Despite the non-existence of clear legal principles on which to base its opinion, the *Lee* Court was guided by equity in allowing the seller Cox to retain the registration certificates.

Similar equities in favor of InterFirst do not exist in this case. Whether this Court should nevertheless extend *Lee* to the present facts, however, is a question which need not be reached. In *Lee*, court-sanctioned retention of registration certificates by the seller made the horses virtually valueless to the buyer Lee. Under the present facts, however, the Rules of the American Quarter Horse Association and testimony of its representatives mandate a different result. Rule 83 of the *Official Handbook of the American Quarter Horse Association* (32d ed. 1984),[5] entitled "Duplicate Certificate", provides that when a court renders a judgment regarding title

---

3. "Placing the registration papers in one of the categories of § 9–305 is difficult. Clearly, they do not constitute letters of credit, negotiable documents of title, chattel paper, or goods, nor do they constitute instruments since they are not negotiable and are not papers 'evidencing a debt' normally transferred by negotiation." *Lee v. Cox, supra* at 809–10.

4. Elsewhere it has been argued that despite the non-negotiability of registration certificates, continued endorsement and delivery of the certificate might be considered a trade custom. *See Lester, supra* at 1068. However, no such trade custom has been shown to exist in the present case. Indeed, such a transfer scheme would be in direct violation of the *Official Handbook of the American Quarter Horse Association* Rules 86–92.

5. Rule 83 provides, in relevant part, "A duplicate is a new registration certificate issued when the original has been lost or destroyed. It is issued when sufficient proof of loss and proper identification of the horse has been submitted to the Association office. *In regard to involuntary transfer of title situations, including but not limited to court judgments and stableman's lien or security interest foreclosure, when it is proven to the Association's satisfaction that a previous owner is unavailable for affidavit concerning the original certificate or refuses to implement the court's judgment by delivering the original certificate for transfer, at the Association's discretion and in the interest of equity, requirement of affidavit of the record owner may be waived and the current owner deemed eligible for duplicate certificate".* [Emphasis supplied].

to an American Quarter Horse and the holder of the original certificate refuses to implement that court's judgment by delivering the certificate for transfer, the party to whom the judgment was awarded will be deemed eligible for a duplicate certificate. It is the testimony of representatives of the American Quarter Horse Association and the effect of Rule 83 that, under the facts of this case, the registration certificate properly follows the title to the horse. Even assuming InterFirst has a valid security interest in the certificate itself, such certificate has no value in and of itself and can be replaced once the superior title to Shawne Bug is proved to the satisfaction of the A.Q.H.A. Additionally, under A.Q.H.A.'s rules, the certificate itself is owned by the A.Q.H.A. and not the debtor.

The A.Q.H.A. is a private association which registers and issues certificates of registration for quarter horses possessing sufficient pedigree and physical characteristics to meet its standards. A.Q.H.A. promotes American quarter horses. The A.Q.H.A. official handbook, with its corporation by-laws, registration rules and regulations, show and contest rules, amateur rules and regulations, youth activities, and American Junior Quarter Horse Association Constitution consists of 128 pages, mostly single-spaced.

The A.Q.H.A. records ownership of registered horses to assist in its program of owner awards at year-end in certain categories of registered horse's performance. A.Q.H.A. establishes rules for approved quarter horse meets or races and non-parimutuel racing.

## II.

### CLASSIFICATION OF BREEDING RIGHTS OF SHAWNE BUG UNDER THE CODE AS GOODS OR GENERAL INTANGIBLES

If InterFirst's possession of the A.Q.H.A. registration certificate on Shawne Bug does not perfect any interest in Shawne Bug absent title thereto, InterFirst can prevail only if (1) the breeding rights in Shawne Bug are properly characterized as general intangibles under Code § 9.106; and (2) such breeding rights were not sufficiently described in the security agreement and the financing statement of Levis under Code §§ 9.402(a), 9.203(a) and 9.110.

Code § 9.106 provides the definition of general intangibles as "any personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents and instruments". The Official Comment clarifies by listing goodwill, literary rights, rights to performance, copyrights and patents as examples. InterFirst has cited several cases by analogy dealing with patents, trademarks, goodwill, blueprints and technical data, and a commercial clamming license. *See In re Emergency Beacon Corp.*, 23 U.C.C.Rep. 766 (S.D.N.Y. 1977); *In re Magnum Opus Electronics, Ltd.*, 19 U.C.C.Rep. 244 (S.D.N.Y.1976); *United States v. Antenna Systems, Inc.*, 251 F.Supp. 1013 (D.N.H.1966); *First Pennsylvania Bank N.A. v. Wildwood Clam Co., Inc.*, 535 F.Supp. 266, 33 U.C.C. Rep. 686 (E.D.Pa.1982). Although these cases have certain appeal for the proposition that breeding rights are likewise general intangibles, the cases are clearly distinguishable upon closer analysis. The Court in *Emergency Beacon* classified the debtor's patent rights, tradenames, customer lists, books and records, and its right to manufacture or sell emergency beacons as general intangibles. In so doing, the Court emphasized that these items were general intangibles under § 9.106 because they were "a *separate* species of property *of intrinsic value* ...". *Emergency Beacon, supra* at 770 [emphasis supplied], *quoting Magnum Opus, supra* at 243 (also cited by InterFirst). "Intrinsic" is defined as "belonging to the real nature of a thing; not dependent on external circumstances; essential; inherent ...". WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 739 (2d College ed. 1970). The examples of general intangibles listed by the Official Comment to § 9.106, *i.e.*, goodwill, literary rights, rights to performance, copyrights, trademarks and patents, and the examples fur-

nished by cases cited by InterFirst, all have value independent of external circumstances.

In the present case, the unsevered breeding rights in the horse are valueless without the horse and, therefore, by definition, do not have intrinsic value which would allow characterization as general intangibles. *See Lester, supra* at 1070.

A case more directly on point is *North Ridge Farms v. Trimble*, 37 U.C.C.Rep. 1280 (Ky.Ct.App.1983), which provides an extensive discussion of the classification under the Uniform Commercial Code of Interests in thoroughbred horses. This case centers around the sale of a fractional interest in a thoroughbred stallion and the subsequent partial transfer of the interest. The Kentucky Court of Appeals' classification of interests secured in these transactions provides a sound analytical framework applicable to the present case.

The issue to be decided by the Court was whether North Ridge had purchased the 1982 breeding season of the stallion, Affirmed, free of the security interest of Wolfson (as redeemed by Trimble's principals).

Essential to the *North Ridge* decision, and highly relevant to the present case, was the classification of the collateral in the hands of each of the respective parties. As a starting point, the Court cited *Keck v. Wacker*, 413 F.Supp. 1377 (E.D.Ky.1976), for the proposition that a thoroughbred horse is defined as "goods". *See* U.C.C. § 9–105(1)(f); more specifically, these goods are defined as "farm products", *see* Code § 9.109(3). Despite the characterization of a thoroughbred horse as "goods", it was argued on appeal that what was actually conveyed by the syndication agreement was an account, contract right, or general intangible. *See* U.C.C. § 9–106. The Court disagreed and held that because the syndication agreement specifically categorized the owners of the fractional shares as tenants in common that what was conveyed was a partial interest in the horse and, therefore, goods. *See also, Harry F. Gug-*

*genheim*, 46 T.C. 559 (1966) (syndicated share in a thoroughbred stallion is not an intangible which would require taxation as ordinary income).

The importance of the holding of the *North Ridge Farms* case to the present case (where there is no syndication agreement to construe) is that a tenancy in common of the substance of the horse and the rights to breed such horse are both characterized as a partial interest in goods, not general intangibles.

The Court in *North Ridge Farms* next held that, in the hands of North Ridge, the severed breeding rights were classified as general intangibles. The significance of this holding is that it defines the perimeters of classification of a horse's breeding rights as goods. "At the time an annual breeding season is severed from the fractional interest, however, it is our opinion that at that point it ceases to be goods". *North Ridge Farms, supra*, 37 U.C.C.Rep. at 1291.

In the present case, Levis sold Debtor an American Quarter Horse Stallion and retained a purchase money security interest in all interests in the horse. The purchase agreement between Debtor and Levis indicated that the debtor intended to simultaneously syndicate the breeding rights to Shawne Bug and that Debtor agreed to assign to Levis one breeding right to Shawne Bug and other named stallions or substitutes to such other stallions. No syndication agreement on Shawne Bug, except as stated aforesaid in the purchase agreement itself, was shown to exist. There is nothing before this Court that would indicate a severance and assignment of breeding seasons. Shawne Bug, the American Quarter Horse Stallion, and his unsevered breeding rights are therefore properly characterized as goods and properly perfected by Levis' purchase money security interest taken in the Stallion.

Even if the unsevered and unassigned breeding rights in Shawne Bug were classified under § 9.106 as general intangibles, Levis would still have a prior

perfected security interest in such property because the Levis security interest "in and to all of the debtor's interest and property rights in ... Shawne Bug" is sufficiently broad to include unsevered breeding rights in the horse.

Article Nine of the Uniform Commercial Code provides a basic system of notice filing for security interests. This theory of notice filing "permits a creditor searching to determine from the financing statement itself whether certain types of goods *may* be encumbered. If the financing statement *suggests* they are, then he must make further inquiry to find the complete state of affairs". WHITE & SUMMERS, *Supra* § 23–16 at 961 [emphasis supplied]. InterFirst was sufficiently apprised by the description in Levis' financing statement of Shawne Bug as a registered American Quarter Horse to require InterFirst to make further inquiry as to the extent of Levis' security interest in the horse. *See* § 9.402(a). Upon inspection of the security agreement signed by Debtor and Levis, InterFirst would have found that, in consideration of a promissory note in the principal amount of $1,000,000, debtor granted Levis a purchase money security interest "in and to all of the debtor's interest and property rights" in Shawne Bug. The sufficiency of such a description of collateral is governed by Code § 9.110, which provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described". The Official Comment to § 9.110 further clarifies by indicating that a description need only "make possible the identification of the thing described". To determine whether breeding rights were effectively described by Levis' security agreement, it is helpful to go through the twofold inquiry of sufficiency of description of collateral set out in WHITE & SUMMERS, *supra* § 23–3 at 912: "first, can the required written description reasonably be read to include the disputed property; and second, did the parties actually intend that description to include the disputed property".

Since the security agreement granted Levis a purchase money security interest "in and to *all* of the debtor's interest and property rights" in Shawne Bug, it is not difficult to reasonably conclude that unsevered breeding rights, were thereby encompassed. That the parties actually intended that description to include unsevered breeding rights may be determined from the plain wording of the written agreements between the parties and the circumstances existing at the time of the initial transaction between Levis and the debtor. When the seven-year-old horse was purchased by Debtor for $1,250,000, the only real value of the horse to secure the Levis indebtedness was the potential income to be received from breeding.

For reasons set forth in this Opinion, Levis has a prior perfected security interest in all of the debtor's interest, including breeding rights, in Shawne Bug.

A judgment will be entered in accordance with the foregoing Opinion.