607 So.2d 468 (1992)
J.V. SHIELDS, Appellant,
v.
EQUINE CAPITAL CORPORATION, Appellee.
No. 91-2809.
District Court of Appeal of Florida, Fifth District.
October 9, 1992.
*469 John McKeever of Pattillo & McKeever, P.A., Ocala, for appellant.
Karl F. Hart of Hart, Fuller & Smith, P.A., Ocala, for appellee.
GRIFFIN, Judge.
This is the appeal of a summary final judgment entered in favor of appellee, Equine Capital Corporation ("ECC"). We reverse.
On June 13, 1990, appellant, J.V. Shields, Jr. ("Shields"), owner of a mare, Henrietta's Bid, and her foal, filed an action for declaratory relief against ECC seeking to establish his right to a stallion service certificate[1] in the possession of ECC. This certificate is necessary for Shields to obtain a Jockey Club registration certificate documenting the foal as a thoroughbred.
In early 1988, Shields' agent contacted Happy Valley Farm, the manager of a syndicated[2] stallion, Crafty Prospector, and *470 entered into an agreement to breed Henrietta's Bid to Crafty Prospector during the 1988 breeding season for a fee of $15,000, refundable if the mating did not produce a live foal. The foal conceived from that breeding was stillborn. In lieu of a refund, Shields contracted with Happy Valley Farm to rebreed his mare during the 1989 breeding season. On the line provided for "service fee" on this second stallion service contract appeared the phrase, "No charge in lieu of refund."
The problem in this case arose because Roger Kumar, the owner of the share used for the 1988 season (Share No. 23), was not the owner of the share used for the 1989 season (Share No. 40). The owner of Share No. 40 of the Crafty Prospector syndicate was Happy Valley Farm. Happy Valley Farm was a partnership consisting of Gary L. Wolfson and Stephen P. Wolfson.[3] These partners, along with Catherine Wolfson and Barbara Wolfson, had previously borrowed money from ECC and had signed, in return, certain promissory notes, security agreements and Uniform Commercial Code ("UCC") 1 and 3 Financing Statements which ECC claims gave it a perfected security interest in Share No. 40, the breeding rights and any stallion service certificates that pertained to such secured breeding rights.
The Loan Agreement executed on February 21, 1989, which had restructured the Happy Valley Farm debt provided in part:
5. Affirmative Covenants:

A. The Debtor shall keep current reports on the following matters and shall submit monthly updates to ECC on the first day of each month beginning March 1, 1989:
i. Sales of any horses, seasons or shares
* * * * * *
iii. Stallion contracts signed
The Security Agreement ("Security Agreement") executed in connection with the Loan Agreement provided in part:
2. THE COLLATERAL: The Collateral in which a security interest is granted is as follows (all of which is referred to as "Collateral"):
(a) All now or hereafter owned stallion shares, breeding rights, fractional interests, and seasons, bonus seasons, and all other rights pertaining thereto owned by the Debtor or in which the Debtor may have an interest (as Lessee or otherwise) whether now existing or hereafter acquired; and wherever located. ("Share Collateral"). Share Collateral now owned is set forth on Exhibit A.[4]
(b) All now or hereafter owned horses, including without limitation, Thoroughbred horses, stallions, mares and all foals thereof (including without limitation, foals in utero at the time hereof or conceived or born thereafter); owned by the Debtor or in which the Debtor may have an interest (as Lessee or otherwise) whether now existing or or [sic] hereafter acquired; and wherever located (which, together with the equine proceeds and products constitute the "Horse Collateral"). Horse Collateral now owned is set forth in Exhibit B.
* * * * * *
(e) All certificates of title, certificates of registration and other evidences of ownership, relating to, or in any way *471 connected with, the Share Collateral or Horse Collateral, including without limitation, all Jockey Club registration papers, all stallion share certificates, all stallion service certificates, certificates of foal registration, and stallion syndication agreements.
* * * * * *
5. OBLIGATIONS OF DEBTOR: Debtor hereby agrees with Secured party that Debtor:
* * * * * *
(i) Except as provided in this Security Agreement, Will not dispose of any of the Collateral, including proceeds and products thereof, by sale or otherwise including without limitation, the transfer of any season to be used in foal sharing, the sale of a foal born to a horse or on a season, or the sale of a mare in foal which was bred on a season
* * * * * *
(n) Will pay to secured Party the proceeds (i.e., gross proceeds minus reasonable sales commissions due unrelated parties) from all sales of Collateral and said payment will be applied as set out in the Note.[5]
The record suggests that ECC demanded Happy Valley Farm deliver the Henrietta's Bid/Crafty Prospector stallion service certificate to ECC. In its answer and counterclaim, ECC admitted it had refused Shields' demand for the stallion service certificate, "until the stud fee for same has been paid",[6] based on its perfected security interest in Share No. 40 of the Crafty Prospector syndicate. Shields thereupon filed a motion for summary judgment, arguing no genuine issue of material fact existed and he was entitled to judgment on five grounds: (1) ECC had failed to plead a security agreement giving rise to a claim to Share No. 40; (2) ECC had assigned its rights to a third party; (3) a breeding right is "goods" under the UCC and Shields was either a purchaser in the ordinary course pursuant to section 679.307, Florida Statutes, or a purchaser of a "farm product" pursuant to the Food Security Act of 1985, 7 U.S.C. § 1631 (1990), and who thereby took free of any security interest; (4) Shields was an account debtor; (5) Happy Valley Farm was allowed under the loan and security agreements to transfer seasons, thereby transferring the security interest as provided in section 679.306(2), Florida Statutes.
Leverett S. Miller, who had arranged the breedings on behalf of Shields, stated in his supporting affidavit that Shields paid the 1988 service fee when due, although he does not say to whom, and that, after the 1988 breeding was unsuccessful, Shields suggested to Happy Valley Farm that it rebreed his mare in lieu of the refund. Miller further asserted that he never received notice of any rights of ECC in Crafty Prospector.
After the hearing on Shields' motion for summary judgment, the trial court entered summary judgment in favor of ECC.[7] The court concluded that although Happy Valley Farm had the right to sell stallion seasons under the ECC security agreement, thereby transferring the security to the proceeds of the sale, ECC was, nevertheless, entitled to withhold the stallion service certificate because ECC also had a security interest in the stallion service certificate.
This appeal raises, among other things, the thorny question of the nature of thoroughbred breeding rights and stallion service *472 certificates as collateral.[8] Unfortunately, the case law that has addressed the collateral character of breeding rights and certificates is very limited. Although there is some law review commentary,[9] it is of limited value because of the dearth of case law. Also, the focus of such analysis has usually centered on the collateral nature of registration certificates; there is almost nothing on stallion service certificates.
We decline the opportunity to enter the void and decide this issue now. First of all, the factual record in this case is not well enough developed for such a determination to be made. More fundamentally, however, we perceive an internal inconsistency in the appealed order. The lower court concluded, based on the security agreement, that ECC had authorized Happy Valley Farm to sell the breeding seasons that were collateralized, which would transfer the security to the proceeds of the sale.[10] The court, nevertheless, concluded ECC was entitled to retain the stallion service certificate because ECC also had a security interest in the certificate. We cannot agree with this conclusion.
Assuming arguendo a stallion service certificate for a mare not owned by a debtor could, under certain circumstances, be an item of collateral separate from a breeding right, we conclude that, unless specifically reserved, implicit in a secured party's authorization to sell a breeding right is also the authorization to provide the customary documentary proof that the breeding had occurred. We reject ECC's contention that it "obviously" never consented to the disposition of the stallion service certificate because it refuses to give it up. It is noteworthy that the two stallion service contracts contained in this record do not expressly require the owner of the stallion to supply an executed stallion service certificate to the owner of the mare; nevertheless, this is plainly the custom in the industry. In other words, what Shields contracted for was a breeding with a thoroughbred, Crafty Prospector, evidenced by a certificate that the thoroughbred breeding had occurred. If Shields paid Happy Valley Farm for the breeding right and if sale of the breeding right was authorized under the ECC agreement, Shields is entitled to the stallion service certificate. We note, however, that ECC steadfastly denies that the agreement or agreements authorized sale of collateral without prior consent and we agree that the agreements are not entirely free from ambiguity. A trial will be necessary to resolve this issue.
We also question whether a stallion service certificate for a mare not owned by a secured party can be collateral.[11] A stallion service certificate appears to be nothing more than a multi-copy form filled out by the owner of the stallion, the top two copies of which are sent to the owner of the serviced mare, verifying the service and the stallion's thoroughbred status. If it is lost or damaged, the owner can simply fill out another one. It is essentially a confirmation that the owner of the stallion has given the promised consideration for the service fee he was paid.
In In re Blankinship-Cooper, Inc., 43 B.R. 231 (Bankr.N.D.Tex. 1984), the court considered which of two lienholders in a horse, the seller or the creditor, held a prior perfected security interest in an *473 American Quarter Horse Stallion. The bankruptcy court found that the registration certificate was owned by the American Quarter Horse Association ("AQHA"), not by the owner of the horse, and that when a judgment regarding title of an AQHA horse had been rendered by a court of law, if the holder of the original certificate refused to implement judgment by delivering the certificate, the AQHA would issue a duplicate certificate. Id. at 234. Because the certificate could only be owned by the AQHA, it did not possess attributes of negotiability and was not the complete embodiment of the underlying right, so it was not an instrument which could be perfected by possession under section 9.305 of the UCC. Id. Our research suggests that the Jockey Club rules are similar in some respects but materially different in others. Robertson, supra, at 674. Lester, supra, at 1071. Certainly the lack of record on such issues will not permit a summary judgment at this stage of the proceedings.
ECC also argues on appeal that even if it were determined that the breeding right or the stallion service certificate were a "farm product" or "goods", Shields could not be a buyer in the ordinary course because the right was gratuitously transferred by Happy Valley Farm or because it was a transfer for total or partial satisfaction of a preexisting debt. These arguments are based solely on the "no charge" language under "service fee" in the second stallion service contract. Appellee ignores the "in lieu of refund" language contained in the same sentence, however. There is presently no evidence in the record of the disposition of the "refund." It is unknown whether the $15,000 was paid by Shields to Robert Kumar or to Happy Valley Farm, as his agent. Nor is it known when or if Kumar got the money or ever returned it to Happy Valley Farm. It evidently would not be unusual in the industry for the breeding fee to be collected by the syndicate manager, as agent for the share owner, and then held or applied to the owner's debts to the syndicate. Lester, supra, 1081-1082.
In any event, it is difficult to see this transaction as "gratuitous." Shields was bound to pay a fee to Happy Valley Farm. He had a right to a refund from Kumar. Shields' agent dealt with Happy Valley Farm as agent for Kumar and as owner of the 1989 breeding right. He had the right under the circumstances to expect that the proper transfer of funds to Happy Valley Farm had been made when the second service contract, providing for "no charge" for the Share No. 40 breeding right "in lieu of a refund" was executed by Happy Valley Farm. On this record, ECC's bad faith argument has no support.
Because there remain multiple issues of fact to be developed in this case, judgment was entered prematurely.
REVERSED and REMANDED for proceedings consistent with this opinion.
W. SHARP and PETERSON, JJ., concur.
NOTES
[1] A stallion service certificate is evidence of the breeding of a thoroughbred stallion to a mare. The usual procedure is for the owner of the stallion to fill out and sign a multi-copy certificate form and deliver two copies to the owner of the mare, who is usually also the owner of the foal. This certificate must be transmitted with an "application for foal registration" in order for the owner of the foal to obtain a registration certificate for the foal from the Jockey Club. Such a registration certificate from the Jockey Club is required for a horse to be raced and bred as a thoroughbred. R. David Lester, Security Interests in Thoroughbred and Standardbred Horses: A Transactional Approach, 70 Ky. L.J. 1065, 1067 (1981-1982).
[2] A thoroughbred breeding syndicate has been described as follows:

Breeding syndicates are designed to provide breeders with access to a valuable stallion when sole ownership is cost-prohibitive. The syndicate usually consists of thirty-two to forty fractional interests. Generally, a fractional interest entitles the owner to breed one mare to a stallion each year. This annual right is commonly known as a "season" or "nomination" and can be sold for any particular year. General supervision and management of the stallion is the syndicate manager's responsibility. Additionally, the syndicate manager is responsible for administrative duties such as record keeping and selection of attorneys and accountants. Compensation to the syndicate manager for these services is usually in the form of four (4) breeding rights per year.
Comment, Kefalas v. Bonnie Brae Farms: A Practical Approach to Thoroughbred Breeding Syndications and Securities Laws, 75 Ky. L.J. 420, 422 (1986-1987) (footnotes omitted).
[3] The record is unclear whether these two individuals were the syndicate manager as "Happy Valley Stallions" partnership or "Happy Valley Farm" partnership, but this distinction is not material to our decision.
[4] Crafty Prospector, Share No. 40, had been identified in prior documents as collateral for the underlying loan, but Exhibit A to the Security Agreement shows:
 CRAFTY PROSPECTOR 79 S HAPPY VALLEY FARM
 by: Mr. Prospector o/o Real Crafty Lady Happy Valley Farm
 Owns: 2 Shares #'s 14, & 39 Ocala, FL

ECC contends the Loan Agreement and Security Agreement "restructured" but did not "replace" "the debtor's obligations."
[5] This agreement also provides that Kentucky law applies.
[6] In its brief, ECC states that the stallion service certificate was "delivered to ECC" but it does not say when or by whom, nor is there any evidence of this certificate in the record.
[7] On appeal, Shields complains initially that ECC never raised perfection of a security interest in the stallion service certificate (separate from the breeding right) prior to replying to Shields' motion for summary judgment; thus Shields was unfairly prevented from responding to this issue. We do not have a transcript of the summary judgment hearing, however, and are thus unable to conclude that the trial court erred in finding this issue appropriately addressed at the hearing as a dispositive basis for entering summary judgment in favor of the nonmoving party.
[8] The basic question is whether the breeding right and/or certificate are classified as "goods", "farm products" or "general intangibles."
[9] Cary Robertson, Thoroughbred Certificate Law: A Proposal, 78 Ky. L.J. 659 (1989-1990); Comment, supra note 2; Lester, supra note 1.
[10] Section 679.306(2), Florida Statutes (1989) states:

(2) Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
[11] There is also a dispute whether the stallion service certificate in question is an item of collateral under the Security Agreement. Although Shields' interpretation is consistent with our view of the status of stallion service certificates, this issue also requires further factual development.